# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **PHOSEON TECHNOLOGY, INC.,** | Case No. 3:19-cv-2081-SI |
| Plaintiff, | **TEMPORARY RESTRAINING ORDER** |
| v. | |
| **JENNIFER HEATHCOTE**, | |
| Defendant. | |

Julia E. Markley and Edward Choi, PERKINS COIE LLP, 1120 NW Couch Street, 10th Floor, Portland, OR 97209. Of Attorneys for Plaintiff.

Craig A. Crispin and Ashley A. Marton, CRISPIN EMPLOYMENT LAW PC, 1834 SW 58th Avenue, Suite 200, Portland, OR 97221; Jennifer G. Redmond, SHEPPARD, MULLIN, RICHTER & HAMPTON LLP, Four Embarcadero Center, 17th Floor, San Francisco, CA 94111; Y. Douglas Yang, SHEPPARD, MULLIN, RICHTER & HAMPTON LLP, 333 South Hope Street, 43rd Floor, Los Angeles, CA 90071. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff Phoseon Technology, Inc. ("Phoseon" or "Plaintiff") brings this lawsuit against

Defendant Ms. Jennifer Heathcote ("Heathcote" or "Defendant"). Pending before the Court is

Plaintiff's motion for a temporary restraining order ("TRO"), seeking to enjoin Defendant from:

(a) working or performing any services for or on behalf of either GEW (EC) Ltd. or its United

States subsidiary GEW, Inc. (collectively, "GEW"); (b) soliciting current or prospective

customers of Plaintiff; (c) using, disclosing, or deriving any benefit from Plaintiff's trade secrets or confidential information in any manner; and (d) circumventing, or attempting to circumvent, any temporary restraining order that may be issued by this Court through the use of third-parties, agents, or any business or entity that Defendant owns or controls or is employed by or otherwise affiliated with, including, but not limited to, Defendant's consulting business, Eminence UV.

## STANDARDS

In deciding whether to grant a motion for a TRO, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going

to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

In addition, a temporary restraining order is necessarily of a shorter and more limited duration than a preliminary injunction.[1] Thus, the application of the relevant factors may differ, depending on whether the court is considering a temporary restraining order or a preliminary injunction.[2] Indeed, the two factors most likely to be affected by whether the motion at issue is for a TRO or a preliminary injunction are the "balancing of the equities among the parties" and "the public interest."

## BACKGROUND

Phoseon's co-founder and Chief Financial Officer is Mr. Chris O'Leary. Declaration of Chris O'Leary ("O'Leary Decl."), ¶ 1 (ECF 2 at 141). As explained by O'Leary, Phoseon is a privately-owned electronic manufacturing company based in Hillsboro, Oregon. Founded in 2002, Phoseon makes products that use ultraviolet ("UV") light produced by light emitting diodes ("LED"). These products are used for drying or "curing" inks, coatings, and adhesives in

---

[1] The duration of a temporary restraining order issued without notice may not exceed 14 days but may be extended once for an additional 14 days for good cause, provided that the reasons for such an extension are entered in the record. Fed. R. Civ. P. 65(b)(2). When a temporary restraining order is issued with notice and after a hearing, however, the 14-day limit for such orders issued without notice does not apply. *See Pacific Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1222 n.1 (D. Or. 2016), citing *Horn Abbot Ltd. v. Sarsaparilla Ltd.*, 601 F.Supp. 360, 368 n.12 (N.D. Ill. 1984). Nevertheless, absent consent of the parties, "[a] court may not extend a 'TRO' indefinitely, even upon notice and a hearing." *Id*. Accordingly, unless the parties agree otherwise, a court should schedule a preliminary injunction hearing to occur not later than 28 days after the date that the court first issues a temporary restraining order.

[2] A preliminary injunction also is of limited duration because it may not extend beyond the life of the lawsuit. That is the role of a permanent injunction, which a court may enter as part of a final judgment, when appropriate. A preliminary injunction, however, may last for months, if not years, while the lawsuit progresses toward its conclusion. *Pacific Kidney*, 156 F. Supp. 3d at 1222 n.2.

various commercial and industrial settings. *Id*. at ¶ 2. As further explained by Heathcote, in UV curing, inks, coatings, and adhesives are collectively referred to as "formulations." These formulations move and behave like a liquid or paste but are in fact solids. As a result, the formulations can be jetted, sprayed, dispensed, or physically transferred to other products using a wide range of coating and printing methods. Unlike water-based or solvent-based formulations, UV formulations have photoinitiators that react to UV light. The UV light is absorbed by the photoinitiator, which then transfers energy to the other materials in the formulation causing all the tiny solid material in the formulations to join together in one large chain, effectively converting in a fraction of a second the solid but liquid-like formulation into a solid, cross-linked polymer or plastic. Declaration of Jennifer Heathcote ("Heathcote Decl.") at ¶ 2.

Phoseon has offices in Europe and Asia and sells its products to customers worldwide. When Phoseon began in 2002, the curing industry used arc lamps almost exclusively. Phoseon states that it innovated the use of UV LED instead of mercury arc lamps and that UV LEDs emit less heat, use less power, perform more uniformly, eliminate the need for toxic mercury in the curing process, and allow the user more control than arc lamps. Phoeon further states that UV LED technology has grown rapidly due to its advantages over mercury arc lamps. With more than 300 international patents, including its patented TargetCure™, WhisperCure™, and Semiconductor Light Matrix™ technologies, Phoseon asserts that it is now an industry leader in the widely adopted UV LED curing technology for industrial and commercial applications. O'Leary Decl. at ¶ 2.

Further, the core technologies and design solutions for UV LED curing applications are in constant development, requiring significant time and expense for research and development. Phoseon invests many millions of dollars annually to improve its curing products and related

services and accessories, retain a technological and competitive edge over its competitors, and to acquire and maintain new and existing customer relationships. The development of next generation architectures and design solutions for UV LED curing applications by Phoseon and its competitors can have dramatic effects on the market and each other's products and services. Phoseon asserts that the disclosure of any proprietary information related to Phoseon's UV LED curing systems and products could have disastrous effects on its established market share, product roadmaps, and customer relations. O'Leary Decl. at ¶ 3. The industry for UV curing systems is fiercely competitive. Within the global market for Flexographic curing, for example, there are less than ten major customers worldwide. *Id.* at ¶ 4.

Also, Phoseon's trade secrets and confidential information derive independent economic value from not being generally known to the public or to other persons or entities who can obtain economic value from their disclosure or use. Phoseon adds that it takes reasonable efforts to protect their confidentiality. Every employee at Phoseon must sign confidentiality and nondisclosure agreements. By signing these agreements, each employee explicitly acknowledges that he or she will not use or disclose any of Phoseon's trade secrets and confidential information. In addition, Phoseon employs customary methods to protect its trade secret and confidential information, including policies across the company for protecting such information on its computer networks; using card lock doors for all facilities; and employing full-time IT security services. Phoseon also maintain a policy of only distributing confidential information on a "need to know" basis. *Id.* at ¶ 5.

GEW (EC) Ltd. is headquartered in the United Kingdom and has a subsidiary in the United States, GEW, Inc., located in North Royalton, Ohio. (As stated previously, the Court refers to GEW (EC) Ltd. and GEW, Inc. collectively as "GEW"). GEW is the historic market

leader in UV curing systems using the older technology of mercury arc lamps. Phoseon asserts that with the decline of mercury arc lamps and the rise of UV LED technology in the curing industry, GEW has been trying to transition its business to use the UV LED technology. GEW recently began to offer products and services that compete directly with those offered by Phoseon. Phoseon now considers GEW to be a primary competitor in the global UV LED curing market. *Id*. at ¶ 6.

Phoseon hired Jennifer Heathcote to serve as Phoseon's Regional Sales Manager for the North America region in the UV Printing market segment, commencing June 16, 2014. Heathcote's starting salary was $115,000 per year, in addition to commissions, a hiring bonus, and other benefits. Beginning June 1, 2018, Phoseon transferred Heathcote into the position of Business Development Manager with a focus on Analogue and Flexographic Printing applications. Heathcote worked for Phoseon as a sales and business development executive through October 12, 2018, when Phoseon terminated Heathcote's employment. *Id*. at ¶¶ 7-11. At the time of her termination, Heathcote's title with Phoseon was Global Director of Business Development, and her annual salary was $140,000.

Through Heathcote's two positions at Phoseon and during her four-year tenure, Phoseon gave Heathcote access to Phoseon's trade secret and confidential information relating to Phoseon customers, the market, pricing, strategy, product roadmaps, and product performance. As a Business Development Manager and as Global Director of Business Development, Heathcote worked on global business development and marketing. Specifically, she was responsible for, among other things, developing and implementing sales strategies and action plans to expand Phoseon's presence and sales in assigned territories and vertical markets; creating marketing materials; identifying and penetrating new business in the Analogue Printing market segment and

Flexograhic applications; managing key existing customer relationships; and partnering with engineering and customer support internally and externally to coordinate the delivery and installation of Phoseon's technology. Ms. Heathcote's work required her to travel most of the time, throughout North America and internationally, to meet with current and prospective customers, speak at trade shows, and attend industry events. *Id*.

Phoseon's Regional Sales Managers and Business Development Managers exercise substantial and specialized knowledge, expertise, and professional judgment relating to Phoseon's UV LED products and equipment to perform their work. Phoseon provides and gives such employees access to detailed confidential information about, and extensive training on, the use and technology of Phoseon UV LED products; device and equipment pricing; customer lists; product road maps; and Phoseon's sales strategies regarding both current and prospective customers and markets. Additionally, Sales Managers have access to and use device and equipment pricing lists in their jobs. *Id*. at 12.

On or about April 9, 2014, in advance of her start date of June 16, 2014, Phoseon sent Heathcote a written offer of a job. *Id*. at ¶ 8. As is typical in the niche UV LED industry, due to the confidential and trade secret information that Heathcote would necessarily be exposed and have access to in her position as a Regional Sales Manager, her initial job offer from Phoseon provided that her employment was contingent upon her execution of the Confidential Information, Inventions, Nonsolicitation and Noncompetition Agreement ("Agreement") that Phoseon enclosed with Heahtcote's offer letter. Heathcote signed the Agreement on or about June 16, 2014, her first day of work. *Id*. at ¶ 13.

The Agreement provides, in relevant part:

Section 1.     Definitions

**1.1**     **"Competing Business"** means any business whose efforts

are in competition with the efforts of the Company. A Competing Business includes any business whose efforts involve any research and development, products or services in competition with products or services which are, during and at the end of the Term, either (a) produced, marketed or otherwise commercially exploited by the Company or (b) in actual or demonstrably anticipated research or development by the Company.

**1.2**　**"Confidential Information"** means any information that (a) relates to the business of the Company, (b) is not generally available to the public, and (c) is conceived, compiled, developed, discovered or received by, or made available to, me during the Term, whether solely or jointly with others, and whether or not while engaged in performing work for the Company. Confidential Information includes information, both written and oral, relating to Inventions, trade secrets and other proprietary information, technical data, products, services, finances, business plans, marketing plans, legal affairs, suppliers, clients, prospects, opportunities, contracts or assets of the Company. Confidential Information also includes any information which has been made available to the Company by or with respect to third parties and which the Company is obligated to keep confidential.

\*　　\*　　\*

**1.7**　**"Term"** means the term of my employment with the Company [Phoseon], whether on a full-time, part-time or consulting basis.

Section 2.　　Ownership and Use

\*　　\*　　\*

**2.3**　Except as required for performance of my work for the Company or as authorized in writing by the Company, I will not (a) use, disclose, publish or distribute any Confidential Information, Inventions, Materials or Proprietary Rights or (b) remove any Materials from the Company's premises.

\*　　\*　　\*

Section 4.　　Noncompetition and Nonsolicitation

\*　　\*　　\*

**4.2**　During the Term and *for two years after the end of the Term*, I agree (except on behalf of or with the prior written consent of the Company) that I will not, directly or indirectly (a) solicit,

divert, appropriate to or accept on behalf of any Competing Business, or (b) attempt to solicit, divert, appropriate to or accept on behalf of any Competing Business, any business from any customer or actively sought prospective customer of the Company with whom I have dealt, whose dealings with the Company have been supervised by me or about whom I have acquired Confidential Information in the course of my employment.

**4.3** During the Term and *for two years after the end of the Term*, I will not engage in, be employed by, perform services for, participate in the ownership, management, control or operation of, or otherwise be connected with, either directly or indirectly, any Competing Business. For purposes of this paragraph, I will not be considered to be connected with any Competing Business solely on account of: my ownership of less than five percent of the outstanding capital stock or other equity interests in any Person carrying on the Competing Business. *I agree that this restriction is reasonable*, but further agree that should a court exercising jurisdiction with respect to this Agreement find any such restriction invalid or unenforceable due to unreasonableness, either in period of time, geographical area, or otherwise, then in that event, such restriction is to be interpreted and enforced to the maximum extent which such court deems reasonable. *The Company, in its sole discretion, may determine to waive the noncompetition provisions of this Section 4.3*. Any such waiver shall not constitute a waiver of any noncompetition or forfeiture provisions of any other agreement between the Company and me.

\*     \*     \*

Section 5. Termination of Relationship

\*     \*     \*

**5.2** I agree that at the end of the Term I will deliver to the Company [Phoseon] (and will not keep in my possession, re-create or deliver to anyone else) any and all Materials and other property belong to the Company, its successors or assigns. I agree to sign and deliver the "Termination Certification" attached as Exhibit C.

\*     \*     \*

Section 7.     Miscellaneous

\*     \*     \*

7.5     Governing Law; Jurisdiction; Venue

This Agreement will be governed by the laws of the state of
Oregon without regard to the principles of conflicts of law. . . .

O'Leary Decl. at Ex. 4 (ECF 2 at 167-172) (emphasis added); *see also* O'Leary Decl. at ¶ 13.

The Agreement also contains, as Exhibit C, a document titled "Termination

Certification." The sixth and seventh paragraphs of the Termination Certification state:

> During the Term *and for two years after the end of the Term*, I
> agree (except on behalf of or with the prior written consent of the
> Company) that I will not directly or indirectly (a) solicit, divert,
> appropriate to or accept on behalf of any Competing Business, or
> (b) attempt to solicit, divert, appropriate to or accept on behalf of
> any Competing Business, any business from any customer or
> actively sought prospective customer of the Company with whom I
> have dealt, whose dealings with the Company have been
> supervised by me or about whom I have acquired Confidential
> Information in the course of my employment.
>
> During the Term *and for two years after the end of the Term*, I will
> not engage in, be employed by, perform services for, participate in
> the ownership, management, control or operation of, or otherwise
> be connected with, either directly or indirectly, any Competing
> Business. For purposes of this paragraph, I will not be considered
> to be connected with any Competing Business solely on account of
> my ownership of less than five present of the outstanding capital
> stock or other equity interest in any Person carrying on the
> Competing Business.

O'Leary Decl. at Ex. 4 pages 10 and 11 of 13 (ECF 2 at 176-77) (emphasis added).

Seventeen days before her last day of employment with Phoseon, Heathcote forwarded

Phoseon's confidential 11-page pricing list dated August 2018 to both her personal email

account and to her Phoseon work email account. Heathcote explained to Phoseon that she

forwarded the pricing list to her email accounts "for purposes of opening attached documents on

[her] phone" at the Label Expo ("LE") trade show because "[t]here was no space on the LE

booth this year for bags and laptops." (Heathcote did not explain, however, why she needed to

send the Phoseon confidential price list to both her personal and her work email accounts.)

According to O'Leary, Heathcote had access to this document through her work email account

that was readily accessible by her company-paid smartphone. Heathcote also was no longer in sales at the time of the LE trade show, and, therefore, did not need or require pricing information to perform her normal job duties or responsibilities. O'Leary Decl. at ¶ 14.

On October 12, 2018, Phoseon terminated Heathcote's employment without providing any advance notice. As previously stated, at the time Phoseon terminated her employment, Heathcote's title was Global Director of Business Development and her annual salary was $140,000. On that date, Heathcote spoke by telephone with Ms. Kelly Nguyen ("Nguyen"), a Senior Human Resources ("HR") Generalist at Phoseon. Nguyen told Heathcote that Nguyen would be sending several documents to Heathcote by mail with a copy by email. Nguyen did that on October 12th. O'Leary Decl., Ex. 7 (ECF 2 at 194-203). Nguyen's cover letter to Heathcote, dated October 12, 2018, stated, in relevant part:

> This letter serves as a notice of your termination of employment with Phoseon Technology effective today, October 12, 2018. After thoughtful review and consideration, Phoseon has determined that ending the employment relationship is what is best for the company.
>
> Enclosed is your final paycheck that includes all wages owed to you though your last of employment of October 12, 2018. Your health care coverage will extend through October 31, 2018. . . .
>
> Enclosed is a Severance Agreement and General Release. Please review and let us know if you have any questions. You may also consult with an attorney.
>
> Please review the enclosed Termination Certification, which includes a summary of the obligations under the Phoseon Nonsolicitation and Noncompetition agreement. Please sign and return the Termination Certification along with any outstanding company equipment including but not limited to: laptop, charger, accessories, files, security badge, etc. . . .
>
> Should you have any questions, you may contact Human Resources directly at [telephone number].

*Id.* at Ex. 7 at 2 (ECF 2 at 196). According to Phoseon's O'Leary, Nguyen was an "HR

Generalist" at Phoseon with responsibility for assisting in clerical tasks and carrying out

Phoseon's employment policies. *Id.* at ¶ 15. O'Leary also states that at Phoseon, an HR

Generalist is not an executive with authority to enter into or modify employment contracts, such

as a noncompetition agreement. *Id.*

Heathcote signed both the Severance Agreement and General Release (O'Leary Decl.,

Ex. 9 (ECF 2 at 206-207)) and the Termination Certification (O'Leary Decl., Ex. 8 (ECF 2

at 204-205)). Phoseon also signed the Severance Agreement and General Release; there was no

need or space for Phoseon to sign the Termination Certification. The specific version of the

certification sent to Heathcote by Nguyen and signed by Heathcote, however, stated a *one-year*

term for Heathcote's noncompetition and nonsolicitation obligations. *Id.* According to O'Leary,

the one-year term stated in the Termination Certification was a clerical, or scrivener's, mistake

and that the *two-year* term stated in the Agreement was the operative duration. O'Leary Decl.

at ¶ 15. No one at Phoseon with authority to modify the Agreement approved any change to the

Agreement. *Id.* The sixth and seventh paragraphs of the Termination Certification sent to and

sign by Heathcote upon the termination of her employment with Phoseon stated:

> During the Term *and for two years after the end of the Term*, I
> agree (except on behalf of or with the prior written consent of the
> Company) that I will not directly or indirectly (a) solicit, divert,
> appropriate to or accept on behalf of any Competing Business, or
> (b) attempt to solicit, divert, appropriate to or accept on behalf of
> any Competing Business, any business from any customer or
> actively sought prospective customer of the Company with whom I
> have dealt, whose dealings with the Company have been
> supervised by me or about whom I have acquired Confidential
> Information in the course of my employment.
>
> During the Term *and for one year after the end of the Term*, I will
> not engage in, be employed by, perform services for, participate in
> the ownership, management, control or operation of, or otherwise
> be connected with, either directly or indirectly, any Competing

Business. For purposes of this paragraph, I will not be considered to be connected with any Competing Business solely on account of my ownership of less than five present of the outstanding capital stock or other equity interest in any Person carrying on the Competing Business.

O'Leary Decl. at Ex. 7 pages 8 and 9 of 10 (ECF 2 at 201-02) (emphasis added).[3]

Regarding the issue of Ms. Heathcote's sending Phoseon's August 2018 confidential price list to her personal and work email accounts two weeks before Phoseon terminated her employment on October 14, 2018, Heathcote explains that in September 2018 she forwarded a copy that pricelist to herself "without any thought as to which email address [she] was using" and "had no idea at that time that Phoseon was going to terminate [her] employment 17 days later." Heathcote Decl. at ¶ 30.

Heathcote further states that about one month after Phoseon terminated her employment, O'Leary called Heathcote to say that

Phoseon was holding [Heathcote's] severance pending an acceptable explanation as to why [she] forwarded the price list to [her] personal email. [Heahtcote] promptly explained to O'Leary that [she] had forwarded the price list to [herself] to use at a trade show because of limited space in the booth. O'Leary told [her] he too sometimes emails Phoseon documents to his personal email account. [O'Leary] asked [Heathcote] to delete the price list from [her] phone and email, and to send him an email explaining why [she] had forwarded the price list. Once he received the email, he would authorize payment of my severance. [Heathcote] deleted the price list and confirmed the deletion in a phone call to O'Leary and sent the requested email explaining why [she] had forwarded the price list.

---

[3] The Exhibit C (Termination Certification) that was originally sent to Heathcote shortly before she joined Phoseon in 2014 provided for a noncompetition term of *two years* after the end of her Term with Phoseon. O'Leary Decl. at Ex. 1 page 11 of 17 (ECF 2 at 157); *see also* O'Leary Decl. at ¶ 8.

*Id.* at ¶ 31; *see also* ECF 9 at ¶ 9-2 at 2-3. In response to Heathcote's explanation, O'Leary said only: "Thanks Jennifer." *Id.* at 2. Shortly thereafter, Phoseon sent Heathcote her severance check. Heathcote Decl. at ¶ 31. Phoseon did not raise the issue again for more than one year.

Heathcote began her new job with GEW (EC) Ltd. on November 11, 2019. Heathcote Decl. at ¶ 34. The week before, she notified five friends at Phoseon about her plans. *Id.*; *see also* O'Leary Decl at ¶ 16. On November 15, 2019, Phoseon's counsel sent a cease and desist demand letter to Heathcote. ECF 2 at 74. An exchange of written communications between counsel for Phoseon and counsel for Heathcote followed. On December 3, 2019, Whitmar Publications, Digital Labels and Packaging issued a press release titled "Jennifer Heathcote joins GEW." Declaration of Julia E. Markley ("Markley Decl.") at ¶ 5 (ECF 2 at 41). The next day, December 4, 2019, GEW issued a press release titled "UV curing specialist Jennifer Heathcote joins GEW." *Id.* at ¶ 6. Also on December 4th, GEW's LinkedIn page contained a video announcement of GEW hiring Heathcote as "Business Development Manager at GEW." *Id.* at ¶ 8.

On December 20, 2019, Phoseon sued Heathcote in Oregon state court. ECF 1-2. Phoseon asserts claims of breach of contract and misappropriation of trade secrets. *Id.* Heathcote timely removed the action to federal court on December 22, 2019. ECF 1. Later that day, Phoseon filed a motion for TRO. ECF 2. On December 27, 2019, after reviewing the parties' briefing and evidence, the Court held a hearing on Phoseon's motion.

## DISCUSSION

### A. Likelihood of Success on the Merits

Phoseon argues that it is likely to succeed on the merits of both its claim of breach of contract and its claim of misappropriation of trade secrets. Heathcote first responds that Phoseon is not likely to succeed on its claim of breach of contract for three reasons: (1) Heathcote

complied with the terms of what she contends is a one-year duration of her noncompetition obligation; (2) Phoseon waived any argument that the duration of Heathcote's noncompetition obligation is two years; and (3) Phoseon's asserted two-year noncompetition agreement with Heathcote is unreasonable in both its global geographic scope and its two-year duration. Heathcote also responds that Phoseon is not likely to succeed on its claim of misappropriation of trade secrets for two reasons: (1) Phoseon's asserted trade secrets are too broad to be protectable; and (2) Phoseon has failed to offer evidence that Heathcote has misappropriated its trade secrets or presents a threat of doing so. In addressing these arguments, the Court applies Oregon law pursuant to the parties' 2014 written agreement.

  1. **Phoseon's Claim of Breach of Contract**

     a. **Whether the parties modified the duration of the noncompete obligation**

"It is axiomatic that parties to a contract may modify that contract by mutual assent." *Bennett v. Farmers Ins. Co. of Oregon*, 332 Or. 138, 148 (2001). "Mutual assent, or what historically was considered as the 'meeting of the minds' requirement, may be expressed in words or inferred from the actions of the parties." *Id*. In addition, "[s]uch a modification must be supported by consideration." *Id*.

Based on the O'Leary Declaration, there does not appear to have been a "meeting of the minds" between Phoseon and Heathcote to modify the originally agreed-upon two-year duration of Heathcote's noncompetition obligation to a one-year duration. Heathcote argues, however, that Nguyen had either implied or apparent authority to modify the original contract and that as an agent of Phoseon, Nguyen could bind her principal to such a modification.

"[A]n agent can bind a principal only when that agent acts with actual or apparent authority." *Taylor v. Ramsay-Gerding Const. Co.*, 345 Or. 403, 409 (2008). "Actual authority may be express or implied. When a principal explicitly authorizes the agent to perform certain

acts, the agent has express authority. However, most actual authority is implied: a principal implicitly permits the agent to do those things that are 'reasonably necessary' for carrying out the agent's express authority." *Id.* at 410. There is no evidence that Phoseon explicitly or even impliedly conferred authority upon Nguyen to modify the duration of Phoseon's noncompetition covenants with its employees.

A principal, however, "also may be bound by actions taken that are 'completely outside' of the agent's actual authority, if the principal allows the agent to appear to have the authority to bind the principal. Such a circumstance is called 'apparent authority.'" *Id.* Phoseon allowed Nguyen to send documents to former employees and even to receive and respond to their questions. Nothing in the evidence presented thus far, however, shows that Phoseon allowed Nguyen to appear to have the authority to modify the duration of Phoseon's noncompete provisions. Thus, Nguyen lacked apparent authority, as well as actual authority.

The Court finds that there is a substantial likelihood that Phoseon will prevail over Heathcote's argument that Phoeson modified its agreement with Heathcote to substitute a one-year, rather than a two-year, duration of Heathcote's noncompete obligations. Indeed, based on the evidence presented thus far, it appears that Phoseon, through Nguyen, made a "mechanical error." *See* Melvin A. Eisenberg, "Mistake in Contract Law," 91 CAL. L. REV. 1573, 1577 (2003) ("Mechanical errors are physical or intellectual blunders that result from transient errors in the mechanics of an actor's physical or mental machinery. Mechanical errors should provide a basis for relief from a contract except to the extent that the nonmistaken party has been injured by justifiable reliance on the contract.").

### b.  Whether Phoseon waived its right to enforce a two-year duration

"Waiver is the *voluntary* relinquishment of a known right." *Bennett*, 332 Or. at 156 (emphasis added); *see also Moore v. Mutual of Enumclaw Ins. Co.*, 317 Or. 235, 240 (1993)

("Waiver is the *intentional* relinquishment or abandonment of a known right or privilege.") (emphasis added). "A party to a written contract may waive a provision of that contract by conduct or by oral representation." *Bennett*, 332 Or. at 156; *Moore*, 317 Or. at 241. "Unlike a modification of a contract, waiver can be accomplished unilaterally, and it need not be supported by consideration." *Bennett*, 332 Or. at 156. "Whether a waiver has occurred depends on the particular circumstances of each case," and "a party to a written contract can waive a provision of that contract by conduct or by oral representation." *Moore*. at 240-41.[4]

Thus, Phoseon can unilaterally waive its right to enforce a two-year duration of Heathcote's noncompete obligation, in favor of a one-year duration. Further, such a waiver need not be supported by consideration. Moreover, unlike estoppel, to establish waiver, Heathcote need not show that she relied to her detriment on the perceived waiver. She must, however, show that Phoseon *voluntarily* or *intentionally* waived its right to enforce a two-year duration in favor of a one-year duration.[5]

In support of her assertion of waiver, Heathcote argues that Phoseon offered her a severance package with a general release and a termination certificate containing a one-year noncompete obligation. Heathcote Decl. at ¶ 29. She signed the Severance Agreement and General Release and the Termination Certification on October 31, 2018. O'Leary Decl., Exs. 8

---

[4] The doctrine of waiver is "closely related" to the doctrine of estoppel. *Bennett*, 332 Or. at 157. "If there is no evidence of an intent to waive a contract provision, a party nevertheless may be estopped from relying on that provision if that party led the other party to believe that the provision had been waived, and the other party relied on that perceived waiver." *Id*. at 157-58. In her written opposition to Phoseon's motion for TRO, Heathcote does *not* argue that Phoseon should be *estopped* from attempting to enforce a two-year duration of her noncompete obligation.

[5] Because waiver is an affirmative defense, Fed. R. Civ. P. 8(c)(1), Heathcote bears the burden of proving waiver.

and 9 (ECF 2 at 204-207). According to Heathcore, she "understood at that time that [she] had a one-year noncompete with Phoseon." Heathcote Decl. at ¶ 29. Heathcote also explained: "Because of the noncompete and some personal health issues (major back surgery that required a four-month recovery period), I made very little money in the one-year period of my noncompete. I had 1.5 years of savings when Phoseon fired me." *Id*. at ¶ 33. Heathcote also stated that she waited for her one-year noncompete obligation to expire before accepting a job with GEW on November 11, 2019. *Id*. at ¶ 34. Finally, Heathcote added that she believes that Phoseon terminated another regional salesperson, Tom Calder, in April 2019 but allowed him immediately to take a job with a competitor notwithstanding a two-year noncompete obligation that Calder owed Phoseon. *Id*. at ¶ 35.[6]

Phoseon responds to Heathcote's assertion of waiver by arguing that it did not voluntarily or intentionally waive the originally agreed-upon two-year duration of Heathcote's noncompetition obligation. As discussed above in the context of modification, Phoseon asserts that any reference to a one-year duration was merely a mistake, or a scrivener's error, made by its employee Nguyen. Based on the evidence currently before the Court, Heathcote has not shown that she is likely to prevail in meeting her burden of showing that Phoseon has voluntarily or intentionally waived the two-year noncompete duration.

---

[6] Phoseon responds that Calder's new employer is not a competitor of Phoseon. In addition, in her legal memorandum, Heathcote states that at a 2019 Surface Summit in Dearborn Michigan she informed Phoseon's Director of Sales for the Americas, Mr. Mike Higgins ("Higgins") of Heathcote's intention to work for GEW. ECF 8 at 9-10. She adds that Higgins did not inform Heathcote that Phoseon believed that she had a two-year noncompete obligation or otherwise object to her employment at GEW. *Id.* Nothing in Heathcote's declaration, however, mentions this communication with Higgins.

### c. Whether a global two-year noncompete agreement is reasonable

The original Agreement between Phoseon and Heathcote, which contained a global two-year noncompetition provision, expressly provided the following statement by Heathcote: "I agree that this restriction is reasonable . . . ." Agreement, § 4.3. Heathcote was an experienced professional when she entered into the Agreement and even had experience with noncompetition agreements of shorter duration from previous employment. Heathcote signed the Agreement with open eyes. In addition, its two-year duration was consistent with then-existing Oregon law in 2014, which allowed for a maximum duration of 24 months. *See* Or. Rev. Stat. § 653.295(2) (2013) ("The term of a noncompetition agreement may not exceed two years from the date of the employee's termination. The remainder of a term of a noncompetition agreement in excess of two years is voidable and may not be enforced by a court of this state.").[7] Further, noncompetition agreements lasting two years have been upheld by Oregon courts. *See, e.g.*, *Cascade Exchange v. Reed*, 278 Or 749 (1977) (holding employer entitled to enforcement of noncompetition agreement for period of two years from termination date).

Regarding the geographic scope, the Court notes that both Phoseon and GEW sell their specialized products worldwide. Also, Heathcote engaged in extensive international travel for Phoseon. Finally, at the time that her employment was terminated, Heathcote's title at Phoseon

---

[7] In 2015, the Oregon Legislature changed this maximum duration to 18 months, effective January 1, 2016. *See* § 653.295(2) (2015). The Oregon Legislature in 2015 did not make this amendment retroactive. *See Smith v. Clackamas County*, 252 Or 230, 232 (1968), *overruled on other grounds, Whipple v. Hawser*, 291 Or 475, 487 (1981) ("statutes are presumed to be prospective, and will be considered to be retrospective only when such intent is clearly spelled out"); *see also* 2015 Oregon Laws Ch 429 (HB 3236) ("The amendments to ORS 653.295 by section 1 of this 2015 Act apply to noncompetition agreements entered into on or after January 1, 2016.").

was "Global Director of Business Development." The global geographic scope of the noncompetition provision at issue in this case is not unreasonable.

### d. Conclusion

The Court finds that Phoseon has demonstrated a substantial likelihood of success on its claim of breach of contract.

### 2. Phoseon's Claim of Misappropriation of Trade Secrets

Phoseon argues that its confidential product, marketing, and financial information are all protectable trade secrets. Although Heathcote appears to dispute Phoseon's assertion, for purposes of the pending motion, the Court will assume without deciding that Phoseon is correct. Phoseon also has employed reasonable measures to protect and maintain the secrecy of its trade secrets. Heathcote does not argue otherwise.

Phoseon does not contend that Heathcote actually misappropriated Phoseon's trade secrets. Instead, Phoseon argues merely that Heathcote "threatens" misappropriation. Under Oregon's Uniform Trade Secret Act, the "[a]ctual or threatened misappropriation [of a trade secret] may be temporarily, preliminarily or permanently enjoined." Or. Rev. Stat. § 646.463(1). Phoseon supports its assertion of threatened misappropriation by invoking the "inevitable disclosure" doctrine. Under that doctrine, a plaintiff may prove a claim of trade secret misappropriation merely by demonstrating that a defendant's new employment will inevitably lead that defendant to rely on the plaintiff's trade secrets. *See PepisCo, Inc. v. Redmond*, 54 F.3d 1262, 1270-71 (7th Cir 1995) (upholding injunction against former employee who had access to former employer's strategic plans and, in so doing, noting that certain trade secrets would enable a competitor "to achieve a substantial advantage by knowing exactly how [the former employer] will price, distribute, and market its [products]" and, thus, be in a position "to respond strategically").

Seventeen states appear to have adopted the inevitable disclosure doctrine in one form or another. Those states are: Arkansas, Connecticut, Delaware, Florida, Indiana, Illinois, Iowa, Minnesota, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Texas, Utah, and Washington.[8] Five state appear to have rejected the doctrine. They are California, Colorado, Louisiana, Maryland, and Virginia.[9] That leaves 28 states, including Oregon, that have not yet decided whether to follow the inevitable disclosure doctrine.

Oregon has, however, shown a willingness by legislation to reduce the scope and application of noncompetition agreements. Oregon initially upheld noncompetition restrictions, so long as they were limited in time and place and "reasonably" calculated to protect a legitimate interest of the employer. In 2007, the Oregon legislature dramatically limited the enforceability of noncompetition agreements. *See* Senate Bill 248, passed by the Oregon legislature on June 27,

---

[8] *See, e.g.*, *Cardinal Freight Carriers, Inc. v. J.B. Hunt Transp. Servs., Inc.*, 987 S.W.2d 642, 646 (Ark. 1999); *Aetna Retirement Servs, Inc. v. Hug*, 1997 WL 396212, at *10 (Conn. Super. 1997); *Clearwater Systems Corp. v. EVAPCO, Inc.*, 2006 WL 726684 (D. Conn. 2006); *W.L. Gore & Associates, Inc. v. Wu*, 2006 WL 2692584 (Del. Ch. 2006); *E.I. DuPont de Nemours & Co. v. American Potash & Chemical Corp.*, 200 A.2d 428, 431 (Del. Ch. 1964); *Fountain v. Hudson Cush-N-Foam Corp.*, 122 So.2d 232, 234 (Fla. Dist. Ct. App. 1960); *Ackerman v. Kimball Int'l, Inc.*, 634 N.E.2d 778 (Ind. Ct. App. 1994), *aff'd*, 652 N.E.2d 507 (Ind. 1995); *Barilla America, Inc. v. Wright*, 2002 WL 31165069, at *9 (S.D. Iowa 2002); *La Calhene, Inc. v. Spolyar*, 938 F. Supp 523, 531 (W.D. Wisc. 1996) (applying Minnesota law); *H & R Block Eastern Tax Servs, Inc. v. Enchura*, 122 F. Supp 2d 1067, 1075 (W.D. Mo. 2000); *Fluoramics, Inc. v. Trueba*, 2005 WL 3455185 (N.J. Super. Ch. 2005); *The Estee Lauder Co., Inc. v. Batra*, 430 F. Supp. 2d 158 (S.D. N.Y. 2006); *Merck & Co. Inc. v. Lyon*, 941 F. Supp. 1443, 1460 (M.D. N.C. 1996); *Proctor & Gamble Co. v. Stoneham*, 747 N.E.2d 268 (Ohio Ct. App. 2000); *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 110 (3d Cir. 2010); *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 551 (Tex. App. 1993); *Novell Inc. v. Timpanogos Research Group Inc.*, 1998 WL 177721 (D. Utah 1998); *Solutee Corp., Inc. v. Agnew*, 1997 WL 794496 (Wash. Ct. App. 1997).

[9] *See, e.g.*, *Bayer Corp. v. Roche Molecular Sys., Inc.*, 72 F Supp 2d 1111, 1120 (N.D. Cal. 1990); *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 626-27 (Colo. App. 2011); *Tubular Threading, Inc. v. Scandaliato*, 443 So.2d 712, 715 (La. Ct. App. 1983); *LeJeune v. Coin Acceptors, Inc.*, 849 A.2d 451, 471 (Md. 2004); *Motion Control Sys., Inc. v. East*, 546 S.E.2d 424 (Va. 2001).

2007 and signed by Gov. Kulongoski on August 6, 2007. As discussed above, the statute was

further restricted in 2015, effective January 1, 2016. If one evaluates the likelihood of the Oregon

Supreme Court adopting the inevitable disclosure doctrine by considering the history of

legislation over the years, the result does not yield confidence that the doctrine will be adopted in

Oregon anytime soon. *See generally* Shannon Aaron, "Using the History of Noncompetition

Agreements to Guide the Future of the Inevitable Disclosure Doctrine," 17 LEWIS & CLARK L.

REV. 1191 (2013).

In light of the Court's conclusion finding that Phoseon has demonstrated a substantial

likelihood of success on its claim of breach of contract, the Court declines at this time to decide

whether Phoseon's claim of threatened misappropriation of trade secrets also is likely to succeed.

## B. Irreparable Injury

An "enforceable noncompete agreement affords fair protection to a legitimate interest of

the former employer, and, thus, a breach of the agreement causes harm." *Brinton Bus. Ventures,*

*Inc. v. Seatle*, 248 F. Supp. 3d 1029, 1039 (D. Or. 2017) (internal citation omitted). Moreover,

the misappropriation of trade secrets constitutes *prima facie* evidence of irreparable harm. *See*

*Alexander & Alexander Ben. Serv., Inc. v. Benefit Brokers & Consultants, Inc*., 756 F. Supp.

1408, 1414 (D. Or. 1991) (finding that plaintiff would suffer irreparable harm "in the form of the

loss of valuable and confidential business information"). It is also well-established that "that the

loss of trade secrets cannot be measured in money damages. A trade secret once lost is, of

course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co*., 730 F2d 61, 63 (2d Cir.

1984). For purposes of the pending motion, the Court is satisfied that Phoseon has demonstrated

a substantial likelihood of irreparable harm if a TRO is not issued.

## C. Balance of Equities

Balancing the equities is, perhaps, the most difficult part of the analysis in resolving the pending TRO motion. On the one hand, Phoseon and Heathcote entered into a contract containing a two-year noncompetition provision to protect Phoseon's trade secrets and other confidential information. On the other hand, when Phoseon terminated Heathcote's employment, its employee Nguyen sent Heathcote a Termination Certification that showed only a one-year noncompete duration. Even accepting that was a mistake, or a scrivener's error, by Phoseon, there is no indication that Heathcote realized that Phoseon had erred. Further, this is the sort of error that Phoseon easily could have avoided or corrected with greater diligence and care. For example, Phoseon's termination letter to Heathcote could have reminded her of her two-year noncompete obligation. Also, when O'Leary spoke with Heathcote and exchanged emails with her shortly after Phoseon terminated her employment, O'Leary could have said something about the two-year duration. Instead, Heathcote believed that she needed to refrain from competing only for 12 months, not 24.

Heathcote did not seek other employment that would have been consistent with her noncompete obligation during her first 12 months after her employment was terminated. Instead, she lived off of her savings, which she states totaled about one and one-half years of salary. The record currently does not show whether Heathcote would have sought employment or would have done anything differently had she known in October 2018 that her noncompete duration was actually 24 months, rather than 12 months. Nevertheless, the Court does not want to cause undue or unfair harm to Heathcote while the Court is protecting Phoseon's contract rights, especially since Phoseon could have avoided that unfairness had it acted more diligently in October 2018. Accordingly, although the Court is prepared to enter a TRO for 28 days, it will do so only if Phoseon first pays Heathcote a non-returnable payment equal to one month's gross

salary based on the salary Heathcote was earning when Phoseon terminated her employment. Relatedly, to reduce the burden somewhat on Phoseon, the Court will relieve Phoseon of the need to post security under Rule 65. Phoseon seeks equitable relief from the Court. This result, the Court believes, is equitable to all parties.

**D.  Public Interest**

The public interest supports the enforcement of valid contracts. *See Pulse Techs., Inc. v. Dodrill*, 2007 WL 789434, at *12 (D. Or. March 14, 2007) (finding that a grant of preliminary injunction would "protect the public interest of enforcing a contract which the parties entered into voluntarily"). At this stage of the litigation, the Court is satisfied that the public interest support entering an TRO.

**TEMPORARY RESTRAINING ORDER**

1.      Immediately upon the payment or tender by Phoseon Technology, Inc. to Jennifer Heathcote or her counsel of the sum of $11,667.00, Jennifer Heathcote is temporarily restrained and enjoined from taking any of the following actions:

a.      working or performing any services for or on behalf of either GEW (EC) Ltd. or its United States subsidiary GEW, Inc.;

b.      soliciting then-current or then-prospective customers of Phoseon Technology, Inc. as of October 12, 2018 of which Jennifer Heathcote is or was aware;

c.      using, disclosing, or deriving any benefit from Plaintiff's trade secrets or confidential information in any manner; and

d.      circumventing, or attempting to circumvent, this Temporary Restraining Order through the use of any third-parties, agents, or business or entity that Defendant owns in whole or part or controls in whole or part or is employed by or otherwise affiliated with, including, but not limited to Defendant's consulting business, Eminence UV.

2.      In the interest of justice and considering of the non-returnable payment required under paragraph 1, Plaintiff need not provide any security, and all requirements under Rule 65(c) of the Federal Rules of Civil Procedure are waived.

3.      The Court will hold a hearing on **Friday, January 17, 2019, at 9:00 a.m.** in Courtroom 15B of the Mark O. Hatfield United States Courthouse in Portland, Oregon to determine whether to issue a preliminary injunction. The parties shall promptly confer and submit to the Court a proposed briefing and expedited discovery schedule.

4.      This Order expires twenty-eight (28) days after entry, unless otherwise extended by stipulation of the parties or by further Order of the Court.

## CONCLUSION

The Court **GRANTS IN PART SUBJECT TO CONDITIONS** Plaintiff's Motion for Temporary Restraining Order and Order to Show Cause (ECF 2).

**IT IS SO ORDERED**.

DATED this 27th day of December, 2019, at 4:00 p.m.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge